# In re M-B-A-, Respondent

*Decided September 24, 2002*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

A Nigerian convicted of a drug offense in the United States failed to establish eligibility for deferral of removal under Article 3 of the Convention Against Torture because the evidence she presented regarding the enforcement of Decree No. 33 of the Nigerian National Drug Law Enforcement Agency against individuals similarly situated to her was insufficient to demonstrate that it is more likely than not that she will be tortured by a public official, or at the instigation or with the consent or acquiescence of such an official, if she is deported to Nigeria.

FOR RESPONDENT: Star Havasreti, Esquire, St. Petersburg, Florida

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Sylvia H. Alonso, Appellate Counsel

BEFORE: Board En Banc: SCIALABBA, Chairman; DUNNE, Vice Chairman; HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, GRANT, MOSCATO, MILLER, OHLSON, HESS, and PAULEY, Board Members. Concurring and Dissenting Opinion: ROSENBERG, Board Member. Dissenting Opinion: SCHMIDT, Board Member, joined by GUENDELSBERGER, BRENNAN, ESPENOZA, and OSUNA, Board Members.

HOLMES, Board Member:

This case is before us pursuant to a motion filed by the Immigration and Naturalization Service seeking en banc reconsideration of our June 8, 2001, decision sustaining the respondent's appeal. The Service's motion will be granted. Upon reconsideration, our June 8, 2001, decision will be vacated and the respondent's appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a 40-year-old native and citizen of Nigeria who entered the United States on January 16, 1981, as a nonimmigrant visitor. She subsequently adjusted her status to that of a lawful permanent resident on December 1, 1989. The respondent was convicted on January 20, 1995, in the United States District Court, District of Massachusetts, of importation of a controlled substance and possession of heroin with intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 952(a) and 841(a)(1) (1994). She was initially sentenced to 121 months' imprisonment, but her sentence

was later reduced to 78 months as a result of her assistance to Government controlled substances investigations.

On May 21, 1999, the Service issued a Notice to Appear (Form I-862) charging that the respondent is removable under sections 237(a)(2)(A)(iii) and (B)(i) of the Immigration and Nationality Act, 8 U.S.C. §§ 1227(a)(2)(A)(iii) and (B)(i) (Supp. V 1999), as an alien convicted of an aggravated felony and a controlled substance violation. In proceedings before the Immigration Judge, the respondent, through counsel, admitted the allegations of the Notice to Appear and conceded that she is removable as charged. The Immigration Judge concluded that the respondent's conviction and sentence precluded her from establishing eligibility for any relief other than deferral of removal under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "Convention"). The respondent does not dispute the Immigration Judge's finding in this regard.

In her application for protection under the Convention Against Torture, the respondent stated that if she is returned to Nigeria she would be imprisoned and tortured as a result of her drug conviction in this country. In support of this claim, the respondent submitted a detailed affidavit, evidence of country conditions in Nigeria, and a copy of a 1990 Nigerian federal military government decree which, in part, criminalized the conduct of Nigerians who are convicted of narcotic drug offenses in a foreign country and bring the name of Nigeria into disrepute, or who are detected carrying a narcotic drug into a foreign country after a journey originating from Nigeria. *See* National Drug Law Enforcement Agency (Amendment) Decree 1990, Decree No. 33 (Oct. 10, 1990) ("Decree No. 33").

During proceedings before the Immigration Judge on December 14, 1999, the respondent testified that she had traveled to Nigeria in 1993 to meet her then-fiancé's family and had been unwillingly involved in drug trafficking by his relatives and associates when she traveled back to the United States. She testified that because of this conviction she would be immediately turned over to drug enforcement authorities and imprisoned if she is returned to Nigeria, that she would be in jail for years before she would be able to see a judge, that she was subject to a mandatory 5-year term of imprisonment, and that she would be subjected to torture while jailed.

When asked how she knew that this would occur, the respondent referred to Decree No. 33 and also testified that some years before she had communicated with an unnamed Nigerian friend who had been convicted of a drug offense in this country and then returned to Nigeria. The respondent indicated that she spoke by telephone to her friend and her friend's parents in 1995. She was told that her friend had been detained upon her return to

Nigeria in 1995, that her family had had to bring food and medication to the jail and pay money for her protection, that she slept on the floor, and that "you probably get raped and beat down" by the guards because they have authority to do "whatever they can do." Her friend remained in jail for 2 months until her family paid a bribe to get her released. The respondent did not know whether her friend had gone before a judge before being incarcerated or whether she had been raped in prison. The respondent testified that she had had a letter from her friend, but that the Service had misplaced "all of her paperwork" while she was in transit and that she no longer knew the whereabouts of her friend.

The respondent further testified that there was no one to help her in Nigeria if she were jailed. Her father had died and her mother was "presently" living in England with her mother's sister. However, the respondent's mother was not a citizen or resident of the United Kingdom and the respondent did not know how long she would be staying in England. The respondent testified that all of her brothers and sisters were in the United States and that her only relations in Nigeria were an uncle and his children, but that they would not assist her and she would not even want her uncle to know that she was in Nigeria because he had sexually abused her as a child. The respondent did not present any testimony from her siblings in this country or otherwise testify regarding her relationship with them or their individual circumstances.

The respondent testified, and provided supporting medical evidence, that she suffers from depression, a chronic ulcer, and asthma. She stated that she had no one to rely on to supply her with medicine if she were jailed in Nigeria. In addition, the respondent testified that she would probably be beaten and raped by prison guards. She stated that most women are subjected to such treatment in prison and that the government does not have the ability to protect them. She also claimed that she would be particularly vulnerable because her ex-fiancé would pay prison guards to harm her because of her cooperation with drug enforcement authorities in this country. The respondent indicated that her ex-fiancé was now in Nigeria, but she did not testify to any communications from or about him, or otherwise identify a specific basis for her claim that he had the ability and intent to cause her harm if she were detained in Nigeria.

Following this hearing, the Immigration Judge requested that the parties file briefs to address the issues presented, including whether the respondent would be imprisoned without trial upon her return to Nigeria. The Service filed a memorandum in which it noted that it was unclear whether Decree No. 33 was still in effect or had been repealed by the 1999 Constitution of the Federal Republic of Nigeria. In a decision dated January 5, 2000, the Immigration Judge found the respondent removable and denied her application for deferral of removal, concluding that, even if she were imprisoned under

Decree No. 33, the respondent had failed to establish that it was more likely than not that she would be tortured in prison.

Following an appeal by the respondent, the case was remanded by the Board to the Immigration Judge on September 6, 2000, for procedural reasons arising from the fact that the respondent had not been provided an opportunity to rebut the evidence regarding the new Nigerian constitution that was first raised in the Service's post-hearing memorandum. In that decision, we also specifically directed the Immigration Judge to address the respondent's claim that it is more likely than not that she would be imprisoned if returned to Nigeria. The parties responded by submitting memoranda of law and supporting documents. Neither party sought to present any further testimonial evidence. In a November 29, 2000, decision, the Immigration Judge again denied the respondent's application for relief. He addressed the additional evidence submitted by the parties and concluded that the respondent still had not met her burden of proving that she would be imprisoned and tortured in Nigeria. The respondent filed an appeal from this decision, which was sustained in a Board panel decision issued on June 8, 2001. The Service timely submitted the present motion seeking en banc reconsideration of that decision. We have decided to reconsider the decision en banc. *See* 8 C.F.R. § 3.1(a)(4)(i) (2002).

## II.  ISSUE ON APPEAL

The issue on appeal is whether the respondent has met her burden of establishing that she is eligible for deferral of removal under the Convention Against Torture by proving that it is more likely than not that she will be imprisoned and tortured in Nigeria by a public official, or at the instigation or with the acquiescence of such an official, if she is returned to that country.

## III.  ANALYSIS

In order to establish eligibility for deferral of removal, the respondent must show that it is more likely than not that she will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official. *See* 8 C.F.R. §§ 208.16(c)(4), 208.18(a) (2002); *see also Matter of G-A-*, 23 I&N Dec. 366 (BIA 2002); *Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270 (A.G. 2002); *Matter of S-V-*, 22 I&N Dec. 1306 (BIA 2000). The respondent has claimed that if she is returned to Nigeria she will be arrested and imprisoned without trial for 5 years pursuant to Decree No. 33,[1] and that

_____

[1] This decree provides that a Nigerian citizen who is convicted of a narcotic drug offense in a foreign country, or who is detected carrying a narcotic drug into a foreign country after a journey originating from Nigeria, "shall be liable to imprisonment for a term of five years

(continued...)

477

while in prison she will be tortured by guards. Thus, the respondent must demonstrate, inter alia, that enforcement of Decree No. 33 will more likely than not result in her detention and torture in Nigeria upon her return to that country. We find that she has not met her burden of proof in this regard.

In our decision of September 6, 2000, remanding the case to the Immigration Judge, we noted that the Immigration Judge should more specifically address the respondent's claim that it was more likely than not that she would be imprisoned if returned to Nigeria. On remand, the Immigration Judge advised the parties that he expected that issue to be addressed in their submissions. Although the respondent submitted additional documentation regarding country conditions in Nigeria and evidence in response to the Service's claim that the new Nigerian constitution may have repealed Decree No. 33, nothing further was offered with regard to the manner of enforcement of this decree. It is unclear whether the respondent chose to rest on the evidence of record or was unsuccessful in uncovering any additional information relevant to this matter. Whichever was the case, the respondent's evidence regarding the manner of enforcement of Decree No. 33 largely remains that which was presented at the 1999 proceedings. We find this evidence insufficient to demonstrate that it is more likely than not that the respondent will be detained or imprisoned if she is returned to Nigeria.

The actual status of Decree No. 33 is not entirely clear on the record before us, but we will assume that it has not been repealed and is enforceable. However, even assuming that such is the case, there is little evidence of record on which to base any meaningful conclusion regarding the extent to which this provision is presently enforced, and how and against whom it is enforced. The fact that the decree is written in mandatory terms is not in itself determinative because it is common to couch criminal provisions in such terms. For example, virtually all of the criminal provisions of Title 18, United States Code, omit any specific reference to a right to trial and provide that anyone guilty of the offense in question "shall be punished" or "shall be imprisoned." *See, e.g.*, 18 U.S.C. § 1111(b) (2000) ("Within the special maritime and territorial jurisdiction of the United States, [w]hoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life.").

The respondent's own evidence concerning the present manner of enforcement of Decree No. 33 does not go much beyond conjecture, and her reference to the circumstances that were related to her by her friend and her friend's parents in 1995 involved one individual some 7 years ago under a

---

[1] (...continued)
without an option of fine." *See generally McDaniel v. United States INS*, 142 F. Supp. 2d 219, 223 (D. Conn. 2001); *United States v. Ibekwe*, 891 F. Supp. 587 (M.D. Fla. 1995).

different regime in Nigeria.[2]  While Nigeria has had chronic problems with drug trafficking and has been a country with a poor human rights record and endemic corruption in its judicial system, it is also a country in which "domestic and international human rights groups generally operate without government restriction, investigating and publishing their findings on human rights cases."  Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Nigeria Country Reports on Human Rights Practices - 2001* (Mar. 2002), *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/af/8397.htm. The respondent has been represented in these proceedings since 1999, and the importance of providing evidence on the issue of the likelihood of her detention has been emphasized.  On the record before us, we are not satisfied that she has met her burden of providing adequate evidence to establish that it is more likely than not that her return to Nigeria would result in her detention or imprisonment.

In this regard, we do not find it sufficient for the respondent simply to cite the existence of Decree No. 33 and her unnamed friend's experiences in 1995.  The respondent must provide some current evidence, or at least more meaningful historical evidence, regarding the manner of enforcement of the provisions of Decree No. 33 on individuals similarly situated to herself.  *Cf., e.g.*, *Matter of G-A-*, *supra*, *at* 369-70 ("[W]e find that the respondent would be subject to close scrutiny upon his return [to Iran] after spending 25 years in the United States, and he would likely be detained and interrogated as a result."); *Matter of J-E-*, 23 I&N Dec. 291, 299 (BIA 2002)  ("It is undisputed that the respondent will be subject to detention of an indeterminate length upon his return to Haiti.").

The respondent's eligibility for deferral of removal rests upon a finding that it is more likely than not that she will be identified as a convicted drug trafficker upon her return to Nigeria; that, as a result, she will be detained on arrival; that, when detained, she will be held in detention without access to bail or judicial oversight; that she will be detained for a significant period of time; and that, as a result of this detention, she will suffer mistreatment that rises to the level of torture at the hands of prison guards or authorities.  Given the evidence of harsh and life-threatening prison conditions in Nigeria and the serious drug trafficking problems that Nigerian authorities are attempting to address, the respondent's fear of return to her home country is understandable.  On the record before us, however, we find that the respondent's case is based on a chain of assumptions and a fear of what might happen, rather than evidence that meets her burden of demonstrating that it is *more likely than not* that she will be subjected to torture by, or with the

---

[2]  On May 29, 1999, President Obasanjo was inaugurated to a 4-year term, replacing the previous military regime in Nigeria.

acquiescence of, a public official or other person acting in an official capacity if she is returned to her home country.

Consequently, we agree with the Immigration Judge that the respondent has not met her burden of demonstrating that it is more likely than not that she would be tortured by, or with the consent or acquiescence of, government officials acting under color of law if she is removed to Nigeria.[3] Accordingly, the Service's motion to reconsider will be granted and the respondent's appeal will be dismissed.

**ORDER:**  The motion to reconsider en banc by the Immigration and Naturalization Service is granted, and our June 8, 2001, decision is vacated.

**FURTHER ORDER:**  The respondent's appeal is dismissed.

*CONCURRING AND DISSENTING OPINION:*  Lory Diana Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I agree that the respondent bears the burden of proof as articulated in *Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002), and *Matter of G-A-*, 23 I&N Dec. 366 (BIA 2002),  and that our determination of the motion to reconsider filed by the Immigration and Naturalization Service is governed by those decisions. *See also Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270 (A.G. 2002).  Therefore, I concur to that extent with the majority opinion.

However, measured by the proper standard, the evidence reflects that it is more likely than not that the respondent will be detained and imprisoned under Decree No. 33 or other existing enforcement practices in Nigeria because she has been convicted of drug trafficking, and that the treatment she

_____

[3] Requiring the respondent to meet her burden of proof by presenting evidence from which one would conclude that it is more likely than not that she would be subject to torture if returned to her home country does not convert this burden into a requirement that she establish the likelihood of torture beyond a reasonable doubt.  This is a case in which, in an exercise of caution, the record was specifically remanded, in part, to address the respondent's claim that it is more likely than not that she would be imprisoned if returned to Nigeria.  Yet none of the principal evidence relied upon in the concurring and dissenting opinion of Board Member Rosenberg is evidence of record.  Moreover, the cited news articles would not have changed the result in this case even if they were matters of record.  Two of the three articles make no specific reference to Decree No. 33 and pertain to the enforcement of Nigerian drug laws against those charged with possession of drugs or an attempt to smuggle drugs.  For example, one of these articles discusses a woman detained at the airport in Lagos who was ultimately found to be in possession of heroin with a street value of $100,000.  The third article notes that the controversy surrounding the constitutionality of Decree No. 33 has been laid to rest, but it does not reference instances of its actual enforcement against individuals in the respondent's circumstance.  Rather, the article discusses suspected drug peddlers caught in Nigeria in possession of drugs, including one who was arrested in a second incident of drug possession after having been "granted bail" by a Nigerian court.  As noted above, we have assumed that Decree No. 33 is enforceable, and we have no question that the Nigerian Government is actively attempting to address that country's serious drug trafficking problems.

will be subjected to once in prison will amount to torture. *See* National Drug Law Enforcement Agency (Amendment) Decree 1990, Decree No. 33 (Oct. 10, 1990) ("Decree No. 33"). A fair review of our June 8, 2001, decision, read in light of our recent precedent, requires denial of the Service's motion to reconsider. Accordingly, I dissent.

## I.  ADJUDICATION OF A MOTION TO RECONSIDER

The majority does not explain why it is appropriate to grant reconsideration, but simply proceeds to adjudicate the motion and redecide the appeal in favor of the Service, notwithstanding the fact that a panel of this Board had fully considered the parties' positions on appeal and reached a contrary conclusion. Nevertheless, we are not charged with granting motions to reconsider willy nilly, but must judge them according to an articulated standard, no matter which party files the motion.

A motion to reconsider pursuant to 8 C.F.R. § 3.2(b) (2002) is not broadly available, but is subject to certain restrictions. It is a request that we reexamine our original decision in light of an additional legal argument, an aspect of the case which was overlooked, or an intervening change in the law. *See Matter of Cerna*, 20 I&N Dec. 399, 402 (BIA 1991), *aff'd*, 979 F.2d 212 (11th Cir. 1992) (unpublished table decision); *see also Board of Immigration Appeals Practice Manual*, § 5.7(a), at 70 ("A motion to reconsider either identifies an error in law or fact in a prior Board decision or identifies a change in law that affects a prior Board decision and asks the Board to re-examine its ruling."). Although the majority does not identify any one or more of these bases on which it would be appropriate to grant the Service's motion to reconsider, I am inclined to find that reconsideration is appropriate in light of the intervening decision of the Attorney General in *Matter of Y-L-, A-G- & R-S-R-*, *supra*, as well as our subsequent decisions in *Matter of J-E-*, *supra*, and *Matter of G-A-*, *supra*.

## II.  LIKELIHOOD OF TORTURE BASED ON EVIDENCE IN THE RECORD

The majority's analysis turns on the evidence in the record, finding it to be insufficient to satisfy the respondent's burden of proof under the "more likely than not" standard provided in 8 C.F.R. § 208.16(c)(2) (2002). According to the majority's reasoning, the respondent's claim that it is more likely than not that she will be identified, imprisoned, and subjected to torture upon her return to Nigeria is little more than a product of her speculation. I disagree.

### A. Imprisonment Under Decree No. 33

In moving for en banc reconsideration of our opinion, the Service contends that the Board erred in finding that the respondent met her burden of proving that it is more likely than not that she would be tortured if returned to Nigeria. The Service appears to challenge the existence of Decree No. 33, which provides that any Nigerian found guilty of importation of narcotic or psychotropic drugs or substances abroad, who thereby brings the name of Nigeria into disrepute, is guilty of an offense and liable to be imprisoned for 5 years. *See* Decree No. 33, § 12A(2), (3). The Service contends that the respondent submitted a barely legible copy of section 12A of the Decree and suggests that it is "unclear" whether the law has been repealed.

Although the majority opinion acknowledges the existence of Decree No. 33, the majority rejects the likelihood that it will be enforced and the respondent will be imprisoned. The majority also acknowledges that the respondent testified she would be handed over to drug enforcement officials upon her forcible return to Nigeria, and that she would be detained and subject to 5 years' imprisonment under Decree No. 33, but finds these expressed concerns to be no more than conjecture. In addition, despite conceding that Decree No. 33 continues in force, the majority asserts that the record lacks sufficient evidence to indicate how it is enforced or that it would be enforced against the respondent. *Matter of M-B-A-*, 23 I&N Dec. 474, 478 (BIA 2002). According to the majority, the evidence provided by the respondent offers little more than a "chain of assumptions," which does not meet the respondent's burden of proof. *Id.* at 479.

However, notwithstanding the majority's protestations, we may take administrative notice of the fact that international journalists continue to report the aggressive enforcement of Decree No. 33. *See Matter of S-M-J-*, 21 I&N Dec. 722, 728 n.2 (BIA 1997); *Matter of R-R-*, 20 I&N Dec. 547, 551 n.3 (BIA 1992), and cases cited therein (stating that it is well established that administrative agencies may take administrative notice of commonly known facts). First, a recent news report indicates that, as a result of a Nigerian Federal High Court ruling that the "Decree does not portend double jeopardy," the constitutionality of Decree No. 33 has been affirmed. Sylvester Ebhodaghe, *NDLEA arrests 779 suspected drug peddlers*, The Guardian web site (Lagos, Nigeria), Aug. 4, 2000, *available at* 2000 WL 25038682.

Second, recent news reports confirm that enforcement is even greater under the present Obasanjo regime. For example, on June 17, 2002, the Xinhua News Agency reported that "[t]o stem the spread of the menace, the incumbent administration undertaken by President Olusegun Obasanjo has been keeping up its fights against drug abuse and trafficking among Nigerians by all legitimate means." *110 Drug Traffickers Arrested in Southern*

*Nigeria,* Xinhua News Agency, June 17, 2002, *available at* 2002 WL 22619255.

Third, women are not exempt from being targeted and punished as drug smugglers. As Newsday, Inc. reported in a May 6, 2002, article, the Nigerian drug enforcement agency charged nearly 100 women with smuggling drugs in 2001, and this year's arrests even included a 64-year-old grandmother and a flight attendant for Nigerian Airways. Samson Mulugeta (Africa Correspondent), *Nigerian Drug Rings Using Creative Tactics/Enlist non-profile carriers to help smuggle heroin*, Newsday, Inc., May 6, 2002, at A12, *available at* 2002 WL 2741793. These news articles reflect that the decree exists, that it is actively enforced by the Obasanjo government, and that it is enforced against women.

## B. Torture in Nigerian Prisons

The dissenting opinion of Board Member Schmidt correctly points out that, within the interpretation set forth in *Matter of J-E-*, *supra*, certain prison conditions amounting to "deliberate vicious acts" may constitute torture, even when imprisonment results from the imposition of lawful sanctions. *Matter of M-B-A-*, *supra*, at 488 (Schmidt, dissenting). The dissent notes that Nigerian prison officials, police, and security forces are reported to have deliberately denied inmates food and medical treatment. The dissenting opinion stresses that such deliberate mistreatment is not merely negligent or accidental, but intentional. *Id.* at 490.

Moreover, the dissent indicates that the Department of State country report for Nigeria estimates that reputable human rights organizations have reported that inmates in Nigerian prison custody die daily due to harsh conditions and the denial of medical treatment. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Nigeria Country Reports on Human Rights Practices - 2001* (Mar. 2002), *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/af/8397.htm ("*Country Reports*"). Although the exact number is difficult to obtain because officials fail to keep proper records, such a report certainly raises legitimate questions concerning prison conditions and the deliberate mistreatment of certain prisoners.

Rather than consider how such information in the *Country Reports* bolsters the respondent's claim that it is more likely than not that she will be tortured upon her return to Nigeria, the majority points to the fact that the *Country Reports* indicate that human rights groups generally operate without government restriction in Nigeria. *Matter of M-B-A-*, *supra*, at 479. However, the ability of human rights groups to investigate conditions within Nigeria does not mean that Decree No. 33 is not enforced, that conditions in Nigerian prisons do not rise to the level of torture, or that more definitive

proof of the enforcement of Decree No. 33 should be available to the respondent.

## C. Adjudication Under the "More Likely Than Not" Standard

The United States Court of Appeals for the Eleventh Circuit, in which this case arises, has recognized that "[i]n making out a claim under CAT, '[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Najjar v. Ashcroft*, 257 F.3d 1262, 1303 (11th Cir. 2001) (quoting 8 C.F.R. § 208.16(c)(2) (2001)). The "more likely than not" standard was addressed in *INS v. Stevic*, 467 U.S. 407, 430 (1984), as "a familiar one to immigration authorities and reviewing courts."

By its terms, this standard requires evidence of a greater than 50% chance that an event will occur. See *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987), in which the Supreme Court differentiated the "more likely than not" standard from a less stringent standard, ruling that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." Thus, the "more likely than not standard" requires the applicant to establish the elements of his claim by a preponderance of the evidence.

The preponderance of the evidence standard, which is applied in most civil cases, requires a lesser quantum of proof than the "clear and convincing" standard and is significantly less stringent than the "beyond a reasonable doubt" standard used in criminal proceedings. *Matter of Patel*, 19 I&N Dec. 774, 783 (BIA 1988) (citing *Addington v. Texas*, 441 U.S. 418, 425 (1979)). The burden of showing something by a preponderance of the evidence "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (quoting F. James, *Civil Procedure* 250-51 (1965)). "Unlike other standards of proof such as reasonable doubt or clear and convincing evidence, the preponderance standard 'allows both parties to share the risk of error in roughly equal fashion' . . . ." *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 (1997) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983)); *see also Addington v. Texas*, *supra*, at 423.

In my view, the majority imposes a standard far beyond that required to qualify for relief under the statutory and regulatory provisions of the Convention Against Torture. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26,

1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "Convention"). The majority dismisses proof of Decree No. 33, the respondent's status as a convicted drug trafficker, her forcible return to Nigeria, and evidence of the mistreatment of a similarly situated friend some years earlier, and it demands either more "current evidence" or "meaningful historical evidence" before the respondent can establish that it is more likely than not that she will be identified, imprisoned, and tortured. *Matter of M-B-A-*, *supra*, at 479. If we actually quantify and apply the standard imposed by the majority, we must conclude that the respondent is charged with establishing the likelihood of torture *beyond a reasonable doubt*. However repugnant noncitizens convicted of criminal offenses may be, that is not the proper standard.

It is critical to recognize that we do not have the benefit of an accomplished act to examine. Furthermore, it has long been accepted that "[t]he victim may not know the exact motivation of his or her persecutor, nor . . . are persecutors 'likely to provide their victims with affidavits attesting to their acts of persecution.'" Karen Musalo, *Irreconcilable Differences? Divorcing Refugee Protections from Human Rights Norms*, 15 Mich. J. Int'l L. 1179, 1202 (1994) (quoting *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1985)). Accordingly, in assessing whether it is more likely than not that the respondent will face torture in a Nigerian prison once returned to Nigeria, it is necessary to draw inferences about what may happen in the future and the reasons it may occur. *Matter of S-P-*, 21 I&N Dec. 486, 494 (BIA 1996) (citing *INS v. Elias-Zacarias*, 502 U.S. 478 (1992)).

The Service argues that the June 8, 2001, Board panel erred in finding that Nigeria's prosecution and imprisonment of citizens convicted abroad of drug offenses is a violation of the Convention Against Torture because such conviction and imprisonment is a lawful sanction. The Service asserts in addition that the respondent failed to establish that her treatment in prison would exceed that which would be considered "inherent or incidental" to incarceration and thus amount to torture.[1]

The respondent contends, however, that neither the Immigration Judge nor the Board had any difficulty reading or understanding the content of Decree No. 33. In addition, she notes that she testified that she knew of someone imprisoned pursuant to Decree No. 33 and had provided her attorney with the document. She also cites to documentary evidence she provided substantiating her contentions that prison guards raped and beat female prisoners, and corroborating the deliberate deprivation and withholding of food and medication by prison officials, all of which would cause a woman with chronic asthma, such as the respondent, severe mental and physical pain

---

[1] The Service did not file a brief in response to the respondent's appeal and did not argue any of these points on appeal, but raised most of these arguments before the Immigration Judge.

and suffering. She emphasizes that such intentional mistreatment, even if subject to lawful sanction, defeats the object and purpose of the Convention to prohibit torture and thereby violates the Convention Against Torture.

In *Matter of G-A-*, *supra*, at 369, the Board found that a respondent who believed he would be "subject to torture or death" in Iran because of a drug conviction was entitled to protection under the Convention Against Torture. Our decision relied on evidence that the respondent, who was of a particular ethnicity, was identifiable, and that conditions in Iranian prisons are so severe as to amount to torture. *Id.* at 369-70.

It was the combination of the traits possessed by the respondent in *G-A-* and the evidence of widespread use of torture in Iran that led us to conclude that the respondent was likely to be subjected to torture if deported to Iran. *Matter of G-A-*, *supra*, at 369 (crediting the respondent's testimony that he would be identifiable and come to the officials' attention due to his ethnicity, many years in the United States, and apparent loss of legal status evidenced by deportation). We specifically accepted the respondent's contention that, once identified, "both his criminal history and his attempt to apply for asylum in the United States *would be discovered*, and that he would likely be 'subject to torture or death' as a consequence of 'being deported with a drug conviction.'" *Id.* (emphasis added).

I do not see how either the respondent's circumstances or conditions in Nigerian prisons are meaningfully different or warrant a different result. By virtue of being forcibly removed, the respondent is as identifiable to Nigerian authorities as was the respondent in *Matter of G-A-*. Credible news reports reflect that Decree No. 33 is being actively enforced and that women smugglers are not immune from its enforcement. It may be that as a general rule, prison conditions alone would not meet the definition of torture. *Matter of J-E-*, *supra*. However, as the dissent points out, we must focus on the specific evidence presented in each case rather than relying on blanket conclusions. The majority fails to do so.

The significant factors that should be measured to determine whether it is more likely than not the respondent will be tortured if removed to Nigeria are (1) that the respondent was convicted of drug trafficking; (2) that under current Nigerian law, which is actively enforced, a person convicted of a drug offense is subject to imprisonment for a period of 5 years; (3) that medications are withheld as a means of punishment in Nigerian jails; (4) that the respondent has asthma and, if imprisoned, has no family to provide such medication or any other form of sustenance; (5) that the respondent has a former fiancé who has reason to seek retribution against her; and (6) that rape and other assaults of female inmates are prevalent in Nigerian jails. The respondent may satisfy her burden of proof that it is more likely than not she will be tortured based on the reasonable inferences that can be drawn from these facts in the record.

The evidence presented by the respondent is not merely based on her own fear and speculation, but on solid, uncontradicted evidence of enforcement efforts against smugglers, who are subjected to horrific prison conditions, including denial of medication, assault, and rape by prison guards, all committed by Nigerian Government officials with impunity. The majority's rejection of the respondent's evidence as no more than a "chain of assumptions," *Matter of M-B-A-*, *supra*, at 479, reveals its imposition of an improper standard, leading it to erroneously reject evidence that establishes it is more likely than not the respondent will be tortured if returned to Nigeria.

*DISSENTING OPINION:* Paul Wickham Schmidt, Board Member, in which John Guendelsberger, Noel Ann Brennan, Cecelia M. Espenoza and Juan P. Osuna, Board Members, join

I respectfully dissent.

## I. ISSUE

I agree with Board Member Rosenberg's conclusion that the respondent has shown that it is more likely than not that she will be imprisoned under Decree No. 33 upon return to Nigeria. *See* National Drug Law Enforcement Agency (Amendment) Decree 1990, Decree No. 33 (Oct. 10, 1990) ("Decree No. 33"). I write separately to address the question the majority avoids: whether the respondent more likely than not will be tortured while in prison. I find that she will be tortured.

## II. ANALYTICAL FRAMEWORK

### A. Torture Defined

*Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002), describes a five-part test for determining whether an act of mistreatment rises to the level of "torture" under 8 C.F.R. § 208.18(a)(1) (2002) and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "Convention"). Those five elements are that the act must: (1) cause severe physical or mental pain or suffering; (2) be intentionally inflicted; (3) be inflicted with a proscribed purpose; (4) be inflicted by, at the instigation of, or with the acquiescence or consent of a public official who has custody or physical control of the victim; and (5) not arise from lawful sanctions.

Applying this definition, we found in *Matter of J-E-*, *supra*, that acts such as indefinite detention, inadequate prison nutrition, sporadic light beatings with fists and sticks, and other acts fairly characterized as police brutality do not rise to the level of torture.

On the other hand, we found that deliberate vicious acts such as burning with cigarettes, choking, hooding, kalot marassa (severe boxing of the ears), and electric shock may constitute torture. *Matter of J-E-*, *supra*, at 302. Additionally, in *Matter of G-A-*, 23 I&N Dec. 366 (BIA 2002), we found that torture includes suspension for long periods of time in confined positions, sleep deprivation, severe repeated beatings with cables or other instruments on the back and soles of the feet, beatings about the ears resulting in full or partial deafness, and punching in the eyes likely to result in full or partial blindness.

## B.  Prison Conditions As Torture

In *Matter of J-E-*, *supra*, we effectively established a presumption that mistreatment in prison is not torture under the Convention Against Torture, but merely "cruel, inhuman or degrading treatment"—reprehensible, worthy of condemnation, but not a basis for relief.

To rebut this presumption, a respondent who is likely to be imprisoned upon removal must show that:  (1) "torture" exists in the foreign prison system; and *either* (2) it is probable that any prisoner detained in the system will be tortured, or (3) he or she possesses individual characteristics making it more likely than not he or she will be tortured.

In *Matter of J-E-*, *supra*, the respondent showed that torture exists in the Haitian prison system, but he was unable to satisfy tests (2) or (3).  His claim was therefore unsuccessful.

By contrast, in *Matter of G-A-*, *supra*, the respondent proved that torture exists on a widespread basis in the Iranian prison system.  But he also established that, as a Christian of Armenian descent who spent 25 years in the United States and was convicted of a drug violation in this country, he had a combination of individual traits that made it likely that the Iranian Government would mark him for torture in prison.  We therefore granted him deferral of removal under the Convention Against Torture.

## III.  ANALYSIS

### A.  Torture Exists in the Nigerian Prison System

The most recent Department of State country report on Nigeria describes the abuses that are rampant in the Nigerian prison system.  Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Nigeria Country Reports on Human Rights Practices - 2001* (Mar. 2002), *available at*

http://www.state.gov/g/drl/rls/hrrpt/2001/af/8397.htm ("*Country Reports*").
At least one aspect of that abuse, intentional withholding of needed medical
treatment for improper purposes, which is relevant to this respondent's
situation, constitutes "torture" under the test set forth in *Matter of J-E-*,
*supra*.

The respondent is a chronic asthmatic with no family in Nigeria who could
provide food or proper medical treatment while she is in jail. The *Country
Reports* state that "[p]rison officials, police, and security forces *often denied
inmates food and medical treatment as a form of punishment or to extort
money from them*." *Country Reports*, *supra*, at 6 (emphasis added).

That report goes on to state the following:

> Harsh conditions and *denial of proper medical treatment* contributed to the *deaths* of
> *numerous* prisoners. A reputable human rights organization *estimated* in 1999 that at least
> *one inmate died per day* in the Kiri Kiri prison in Lagos *alone*. According to the Prisoners
> Rehabilitation and Welfare Action (PRAWA) a nongovernmental organization (NGO), dead
> inmates promptly are buried on the prison compounds, usually without notifying their
> families. A nationwide estimate of the number of inmates who *die daily* in the country's
> prisons is *difficult to obtain* because of poor record keeping by prison officials. PRAWA
> and other NGO's alleged that prison conditions were worse in rural areas than in urban
> districts.

*Id.* (emphasis added).

Clearly, death caused at least in part by intentional withholding of medical
treatment for improper purposes is common in the Nigerian prison system.
The extent of the problem probably is understated because of the difficulty
in obtaining accurate documentation from the Nigerian system.

The *Country Reports* also establish that, with respect to torture of
prisoners, "[i]n most cases, neither [sic] the state anticrime task forces, the
police, nor the armed forces were held accountable for excessive, deadly use
of force or the death of persons in custody." *Country Reports*, *supra*, at 1
(emphasis added). Thus, there generally is *no accountability* for acts of
torture committed by Nigerian Government officials.

The *Country Reports* also establish that Nigeria follows traditional Islamic
law and that discrimination and violence against women is an endemic
problem. *Id.* at 17, 18. Women often are imprisoned with men. *Id.* at 7.
The *Country Reports* also make clear that those without family to support
and feed them while in prison face a particularly high risk of death or
mistreatment. *Id.* at 6.

The intentional withholding of medical care for the purpose of extortion or
punishment satisfies the five-part definition of torture set forth in *Matter of
J-E-*, *supra*. First, intentional denial of medical care is a vicious act intended
to cause extreme physical and mental pain and suffering and, as shown in the
*Country Reports*, all too often results in death. The mental anguish is
increased by the victims' knowledge that, upon death, they will be buried in

unmarked communal graves within the prison compound without notification to anyone.

Second, mistreatment inflicted for extortion or punishment is obviously intentional, not accidental, negligent, or merely the natural consequence of living in a poor country. Third, withholding medical treatment for purposes of extortion or punishment constitutes an impermissible "proscribed purpose."

Fourth, this mistreatment is carried out by government prison officials having both official custody and physical control of the victims. The Nigerian Government clearly knows of its occurrence, because the public reports of our own State Department and reputable nongovernmental organizations ("NGOs") reflect that such official mistreatment occurs.

Finally, while it is possible that Nigeria's jailing of foreign-convicted drug offenders, by itself, is a "lawful sanction" under *Matter of J-E-*, *supra*, intentionally denying such prisoners needed medical treatment for reasons of extortion and punishment is *not* a lawful sanction. Indeed, "torture" can *never* be a "lawful sanction" under the terms of 8 C.F.R. § 208.18(a)(3).

## B.  Respondent's Personal Characteristics Make Torture Likely

The respondent is a woman, suffering from chronic asthma, without family to support and assist her in Nigeria, returning from the United States with a drug conviction. Decree No. 33, discussed by the majority, shows, at a minimum, that the Nigerian Government has a particular interest in those returning with foreign drug convictions.

The respondent's combination of personal traits places her in a particularly high-risk category to suffer torture through the intentional denial of medical treatment for her chronic asthma by Nigerian prison officials bent upon improperly punishing or extorting her. Her situation is therefore closer to the individualized claim of the successful applicant in *Matter of G-A-* than it is to the unsuccessful applicant in *Matter of J-E-* who presented a more "generic" claim. Consequently, I find that the respondent more likely than not will be tortured if imprisoned in Nigeria.

## IV.  CONCLUSION

For the foregoing reasons, I conclude that the respondent more likely than not will be tortured by intentional, malicious withholding of needed medical care when imprisoned upon her return to Nigeria. I therefore would grant her deferral of removal under the Convention Against Torture and would deny the motion to reconsider. Consequently, I respectfully dissent.