Abraham Keji OTENAIKE, Petitioner,

v.

John ASHCROFT, Attorney General of the United States, Respondent.

No. 02–4265.

United States Court of Appeals, Seventh Circuit.

Submitted Dec. 16, 2003.*

Decided Feb. 5, 2004.

---

* Oral argument was originally scheduled for December 16, but prior to that we concluded, after an examination of the briefs and the record, that oral argument was unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Richard H. Trais, Chicago, IL, for Petitioner.

George P. Katsivalis, Department of Homeland Security, Chicago, IL, Alison R. Drucker, Arthur L. Rabin, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondents.

Before BAUER, POSNER, and EVANS, Circuit Judges.

### ORDER

Abraham Keji Otenaike petitioned for asylum, claiming fear of political persecution for speaking out in opposition to the then-military government in his native Nigeria. An Immigration Judge (IJ) denied Otenaike's petition, and the Board of Immigration Appeals (BIA) dismissed his appeal. Otenaike did not petition for review of the BIA's decision and instead filed a motion to reconsider and reopen, which the BIA denied. We affirm the BIA's decision and deny the petition for review.

Otenaike, a 40–year–old male born in Lagos, Nigeria, arrived in the United States on April 2, 1998, as a non-immigrant business visitor, ostensibly to represent a Nigerian pro-democracy group at a conference. Otenaike arrived in New York on the day the conference was scheduled to begin in St. Louis, Missouri. Otenaike remained beyond the period authorized by his visa, which was not to exceed July 1998, and petitioned for asylum in September 1998.

In his application Otenaike sought asylum on the basis of the persecution he allegedly had experienced as a pro-democracy activist. Otenaike stated that he had volunteered with several organizations that spoke out against the military government controlling Nigeria at that time and promoted democracy and human rights, including the Movement for Social and Economic Justice (MOSEJ), the Committee Against Child Abuse and Neglect (CACAN), and the National Democratic Coalition (NADECO). Otenaike explained that he was employed at a major Lagos newspaper, *The Vanguard,* as a financial auditor but also had coordinated press activities for these organizations.

Otenaike related that as a result of his activism he was arrested in August 1997 by military officials and detained for four days at the headquarters of the Directorate of Military Intelligence. Otenaike stated that while detained he was beaten with horsewhips, boots, and a gun, and was confined to a dungeon cell where he was

interrogated and threatened. Otenaike claimed that he was eventually released after the publisher of *The Vanguard* "intervened and used his connections and vouched for [his] innocence," but then was hospitalized with a groin injury and lacerations as a result of the beatings. Because the bill for his hospital stay had been paid by his employer, said Otenaike, he was unable to obtain medical records to support his asylum application. Further, Otenaike explained that after a newspaper reported in October 1997 that he had been appointed to chair a committee within NADECO (Otenaike attached a copy of the article to his application) he began "to notice military security operated vehicles" parked around his house in increasing numbers throughout the following months.

According to what Otenaike detailed in his asylum petition and attached documentation, he prepared to leave Nigeria by first obtaining a passport in November 1997. In March 1998 he obtained a letter from the American embassy acknowledging his reported intent to represent MOSEJ at a conference in St. Louis scheduled on April 2–3 and soon thereafter acquired a visa to attend the conference. He explained in his petition that he had not also tried to obtain an exit visa from Nigerian officials because he "feared that the military authorities would seize [his] passport and incarcerate [him]." Instead, he crossed the border by "walking through the bush to the neighboring country of Republic of Benin with the help of a senior immigration officer who was a long time school friend" and who "convinced the immigration authorities in the Republic of Benin to let [him] across the border even without an exit visa." Otenaike noted that the immigration official showed him a list of people that were prohibited from leaving the country and that his name was on that list.

In his application Otenaike recounted that after arriving in the United States he learned from a brother in Lagos that "military security operatives" looking for Otenaike had arrested his wife and beaten and tortured her for five days during questioning. Attached to his asylum petition was a copy of a letter allegedly sent by his wife detailing her arrest and torture. Otenaike also related that in the United States he had continued his activism, attending events supporting a democratic Nigeria both in Washington, D.C., and in Chicago; he suggests that "Nigerian government agents and informers" attended these events. At the hearing Otenaike testified to the same events he described in his application, but added that he used his employment and his friendship with the editor at *The Vanguard* to influence publication of articles related to his political activism.

At the hearing the IJ pointed out that Otenaike's supporting documents generally lacked authenticity. The letter from his wife detailing her torture, for instance, was a photocopy. With regard to the newspaper article Otenaike submitted referencing his involvement with NADECO, the IJ pointed out that because Otenaike had not submitted the original article the document could have been "doctored" to support the asylum claim. Similarly, the IJ noted that the letter from the American embassy stating his intent to attend the St. Louis conference was also an unauthenticated copy.

The IJ also challenged conflicting statements in Otenaike's testimony. The IJ questioned the likelihood that Otenaike would have been permitted to enter the American embassy while he was allegedly being surveilled by government agents. Otenaike explained that he was able to go to the American embassy without raising suspicion because he had been going there

regularly to discuss political issues with an embassy employee, a statement the IJ also found not credible. The IJ also asked Otenaike why he could not provide copies of the pro-democracy articles that he had helped publish in *The Vanguard;* Otenaike responded that he had never thought to request copies from the newspaper's archives. Then, after Otenaike stated that he was not worried about the safety of his wife and children still in Nigeria because his absence eliminated any threat to them, the IJ again confirmed that his wife's alleged arrest and detention occurred in April 1998 following his departure. Otenaike's only explanation for this discrepancy was that the authorities arrested and detained his wife only in an effort to find him, and once he did not return the threat to his family dissipated.

On cross-examination the government attorney further challenged inconsistencies in Otenaike's testimony. She confirmed that *The Vanguard* was a pro-government newspaper and then questioned the likelihood that its publisher would either employ or obtain the release from custody of an "anti-government activist." Otenaike responded that the publisher was unaware of his anti-government activities. Further, Otenaike noted, in permitting anti-government articles to be published, the editor–whom the IJ confirmed was distinct from the publisher–waived the publisher's policies in an effort to garner favor with the Nigerian public. The government attorney also questioned why Otenaike did not arrive in New York until the day the conference began in St. Louis. Otenaike admitted that he never went to St. Louis but explained that the group that sent him to the conference, NADECO, had become concerned that he would not be able to get to the conference and so had sent another representative instead.

Finally, the government attorney questioned inconsistencies surrounding Otenaike's passport. She pointed out that the passport was issued several months *after* his alleged arrest and torture in August 1997. In response, Otenaike stated that he did not obtain the passport through the usual channels; instead, a friend at the newspaper had used his influence to get the passport for him. Similarly, government counsel noted that stamps in the passport presented at the hearing showed that Otenaike had returned to Nigeria in early March 1998 after having successfully left the country, which she suggested was an unlikely scenario for an individual who feared for his safety inside Nigeria. In response to extensive questioning on this issue by both the government attorney and the IJ, Otenaike explained that on both departure and return he had not gone through Nigerian immigration himself; instead, a friend had taken him across the border, where he had waited while the friend had returned to the immigration post and obtained the appropriate exit and entry stamps.

In his decision issued in February 1999, the IJ concluded that Otenaike's testimony lacked credibility and that he had provided no corroborating evidence. The IJ noted the numerous weaknesses in Otenaike's testimony, including his willingness to return to Nigeria in March 1998, his failure to provide any physical evidence of his political activities, his inability to explain the date and location of his arrival, and his lack of concern about the safety of his wife and children in Nigeria. Further, the IJ stated that, even if Otenaike were arrested and beaten in August 1997, that incident alone was insufficient to constitute past persecution. Accordingly, the IJ denied Otenaike's asylum application and denied relief under the Convention Against Torture. On appeal the BIA agreed, affirming the denial of Otenaike's petition be-

cause he had failed either to "contest the Immigration Judge's adverse credibility determination, or identify or attempt to explain the numerous inconsistencies noted by the Immigration Judge in his decision."

Instead of seeking review of the BIA's decision, Otenaike moved the BIA for "reconsideration." Because Otenaike attached new exhibits to his motion–the more recent version of the Country Report on Human Rights for Nigeria and several articles detailing current conflicts in the region–the BIA construed the filing to include a motion to reopen. The BIA denied the motion for reconsideration because Otenaike had not "demonstrated any error" in the BIA's earlier decision and denied the motion to reopen because Otenaike had not "successfully challenged the adverse credibility determination."

■ We note at the outset that as the government correctly points out, we have jurisdiction to review only the BIA's decision denying Otenaike's motions to reconsider and reopen. When a petitioner fails to seek review of the underlying removal order, jurisdiction in this court attaches only to the issues presented in the motions to reconsider and reopen. *Tittjung v. Reno*, 199 F.3d 393, 396–97 (7th Cir.1999). Thus, many of Otenaike's arguments were waived by his failure to petition for review from the BIA's dismissal of his appeal. *See Tittjung*, 199 F.3d at 396–97. Our review of Otenaike's remaining arguments is highly deferential, reversing only for an abuse of discretion. 8 C.F.R. § 1003.2(a); *Dandan v. Ashcroft*, 339 F.3d 567, 575 (7th Cir.2003).

■ To succeed on his motion for reconsideration, Otenaike would have had to convince the BIA to reexamine its original decision dismissing his appeal "in light of an additional legal argument, an aspect of the case which was overlooked, or an intervening change in the law." *In re M–*

*B–A*, 23 I. & N. Dec. 474, 481, 2002 WL 31201697 (BIA 2002); *see also* Board of Immigration Appeals Practice Manual § 5.7(a), at 70 ("A motion to reconsider either identifies an error in law or fact in a prior Board decision or identifies a change in law that affects a prior Board decision and asks the Board to re-examine its ruling."). But as the BIA reasoned in denying the motion, Otenaike had "not demonstrated any error" in its decision dismissing his appeal. In his appeal to the BIA Otenaike stated that the IJ "failed to properly consider the evidence which showed that the alien suffered past persecution and has a reasonable fear of future persecution by the Nigerian government." In his brief statement in support of his appeal–recited here in full–Otenaike simply reiterated that he was entitled to asylum without providing evidence showing why the IJ's adverse credibility finding was incorrect:

The alien established that he has suffered past persecution and that he has a well-founded fear of future persecution by the Nigerian authorities. The alien testified that he was arrested and beaten by the Nigerian police on account of the alien's political opinions and activities. The alien worked for the Vanguard newspaper in Nigeria and that he was very politically active in the democratic movements. Although there has been a recent election in Nigeria, the alien fears that this new regime is not of significant stability or duration so as to show that circumstances have in fact changed in Nigeria and that it would be safe for the alien to return. In fact there is a distinct possibility that the military might once again in the near future take over the government and then the alien's life would be in danger.

Because Otenaike did not even discuss the IJ's credibility determination in his motion

to reconsider, the BIA had no basis on which to grant the motion. *See Awad v. Ashcroft,* 328 F.3d 336, 340 (7th Cir.2003) (denial of motion for reconsideration correct where petitioner failed to challenge basis of IJ's ruling). And since Otenaike's motion for reconsideration also did not contain an additional legal argument or address an intervening change in the law, the BIA did not abuse its discretion in denying the motion.

■ To succeed on his motion for reconsideration, Otenaike would have had to "introduce previously unavailable, material evidence" in his motion. *INS v. Doherty,* 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992) (noting that the BIA can deny a motion to reopen either because the petitioner failed "to establish a *prima facie* case for the relief sought" or "to introduce previously unavailable, material evidence," or because even if the petitioner met those requirements he still would not be entitled to the discretionary relief sought); *see Mansour v. I.N.S.,* 230 F.3d 902, 907 (7th Cir.2000). Along with his motion Otenaike submitted several new documents, including the 2002 Country Report on Human Rights Practices in Nigeria, articles about the Nigerian government's recent suppression of anti-government views, and articles about the government's inability to control violence, crime, and ethnic conflict.

In his brief here Otenaike argues that the evidence he submitted with his motion to reopen was sufficient to meet his burden of proving his status as a refugee. *See* 8 C.F.R. § 208.13 (burden of proof falls on applicant to establish refugee status). To prove eligibility for asylum Otenaike had to show that he was "unable or unwilling to return to ... [Nigeria] because of persecution or a well-founded fear of persecution on account of ... political opinion." 8 U.S.C. § 1101(a)(42)(A); *see*

*INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Otenaike attempts to make this showing by proving that he has a well-founded fear of future persecution on account of his political beliefs. *See Toptchev v. INS,* 295 F.3d 714, 720 (7th Cir.2002). To succeed Otenaike had to present evidence in his motion sufficient to prove that his fear of persecution was "subjectively genuine" as well as "objectively reasonable"; to meet the objectivity prong Otenaike had to provide "specific, detailed facts" showing that he reasonably feared being singled out for persecution. *See Awad,* 328 F.3d at 341.

Because the evidence Otenaike included in his motion to reopen did not show that he would personally be singled out for persecution, the evidence was not material. The evidence addresses only the current political situation in Nigeria; it provides no information specifying why Otenaike would be persecuted individually. Further, the evidence implies that the political situation in Nigeria has improved since Otenaike's departure more than five years ago. For example, one article notes that military rule ended in 1999. Although several of the articles detail human rights violations perpetrated by the government in response to criminal activities and to outbreaks of violence sparked by political demonstrations, none reference violence committed in response to the past expression of anti-government views. Two articles reference violence directed towards members of Otenaike's tribe, Yoruba, and his religion, Christian, but, as the government notes, Otenaike "has never indicated that he personally suffered any discrimination, let alone persecution," on the basis of his tribe or religion. Though the evidence Otenaike submitted shows that "extreme violence" and "political conflicts abound" in Nigeria, it does not show that if he returned he would be singled out for persecution. Accordingly, the BIA did not

abuse its discretion in denying Otenaike's motion to reopen. *See Awad*, 328 F.3d at 342 (because petitioner offered no "specific detailed facts" explaining why she was "likely to be singled out for persecution," the BIA did not abuse its discretion in denying her motion to reopen).

For the foregoing reasons, the petition for review is DENIED.